UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
------------------------------------------------------------------
CLASS REPRESENTATIVES DOLLY SALERNO,
ROBERT SALERNO, and DIANE AMANTIA,
individually and on behalf of all others similarly situated,

*Plaintiffs,*

-against -

CITY OF NIAGARA FALLS; NIAGARA FALLS          Civil Action No.: 1:18-cv-00304-WKS
WATER BOARD; OCCIDENTAL PETROLEUM
CORPORATION, Individually and as Successor in
Interest to HOOKER CHEMICAL AND PLASTICS
CORPORATION; OCCIDENTAL CHEMICAL
CORPORATION, Individually and as Successor in
Interest to HOOKER CHEMICAL AND PLASTICS
CORPORATION; GLENN SPRINGS HOLDINGS,
INC.; GHD SERVICES INC., Individually and as
Successor in Interest to CONESTOGA ROVERS &
ASSOCIATES; MILLER SPRINGS REMEDIATION
MANAGEMENT, INC.; SEVENSON
ENVIRONMENTAL SERVICES, INC.;  GROSS PHC
LLC; DAVID GROSS CONTRACTING CORP.;
GROSS PLUMBING AND HEATING CO., INC.;  NRC
NY ENVIRONMENTAL SERVICES, INC.,
Individually and as Successor in Interest to OP-TECH
ENVIRONMENTAL SERVICES; ROY'S PLUMBING,
INC.; and SCOTT LAWN YARD, INC.;

*Defendants.*

------------------------------------------------------------------

## **COMPLAINT**

Plaintiffs and Class Representatives, Dolly Salerno, Robert Salerno, and Diane Amantia,

each individually and on behalf of all others similarly situated, (the "Class" or "Class Members")

by and through their attorneys, NAPOLI SHKOLNIK PLLC, complaining of the Defendants,

allege the following upon information and belief, except as to the allegations which pertain to the

Plaintiffs and the Class, which are alleged upon personal knowledge.  Plaintiffs' information and

belief are based upon; *inter alia*, the investigation made by and through their attorneys. Plaintiffs, by and through their attorneys as and for their complaint, hereby allege:

## I. INTRODUCTION

1.      Niagara Falls residents have been living in the vicinity of the Love Canal Site on the promise that the approximately 22,000 tons of drummed and liquid Hooker Chemicals & Plastics Corporation's chemical waste buried at Love Canal was safely contained and did not pose, and would not pose, a threat of any kind to them, their children, or their property.   That promise has not been kept.

2.      For years, and possibly decades, this toxic stew of Love Canal chemicals, often referred to as NAPL (non-aqueous phase liquids),  have been migrating into the surrounding area and into the sanitary and storm sewers with outfalls into nearby Black, Bergholtz and Cayuga creeks, as well as the Niagara River.

3.      These toxic chemicals have migrated to residents' properties, where they vaporize and/or vent into homes, exposing entire families to chemicals long ago banned due to their extremely hazardous nature.

4.      This Complaint states individual and class claims for negligence, strict liability nuisance, trespass, property damage, and is seeking medical monitoring, damages in excess of the jurisdictional minimum, as well as punitive damages, exclusive of interest, costs, and attorneys' fees.

5.      This action is brought on behalf of injured residents of Niagara Falls' Love Canal neighborhood, who have suffered physical injury and economic harm as a result of the intentional reckless, wanton, negligent, or otherwise wrongful conduct of each of the Defendants. Each Plaintiff has suffered physical injury as a result of Defendants misconduct and will continue to suffer

physical injury in the future. Such injuries include but are not limited to birth detects, chromosomal abnormalities, bone marrow abnormalities, neurological injuries and/or toxicity, cardiac conditions, pulmonary symptoms, unexplained fevers, skin conditions, behavioral problems, learning disabilities, and dental problems or complications.

6.      Defendants' conduct - which includes but is not limited to the wrongful dumping of toxic substances, the negligent, reckless, and/or ineffective remediation of such contamination, the negligent and/or reckless performance of work in, around, and adjacent to the, sewers in proximity to Love Canal and repeated failures to alert the public at large (and Plaintiffs in particular) of concerns regarding the neighborhood's safety - has created a public health catastrophe.

7.      As a result of the Defendants' misconduct, chemicals have been and continue to be visible to the naked eye on area roads, sidewalks, and grass, and throughout the sewers and storm drains of this residential community, as well as within Cayuga Creek. In addition to the illness and disease suffered by Plaintiffs and the Class, the Love Canal community to this day suffers the stigma of widespread contamination.

8.      The contamination resulting from Defendants' actions has also caused the adult Plaintiffs and the Class severe economic harm, including the diminution of value of Plaintiffs' homes.

9.      The economic harms that each Plaintiff and the Class have suffered also include substantial medical expenses, including but not limited to out of pocket expenses, to treat the various medical conditions caused by Defendants' misconduct.

10.     Accordingly, Plaintiffs and the Class seek compensatory and punitive damages for, inter alia, personal injuries, lost quality of life, economic loss of services and support of the infant Plaintiffs, loss of spousal consortium and support, economic losses, future medical damages, and

property value diminution. Plaintiffs further seek equitable relief in the form of complete remediation of the contamination within, around, and under their properties as well as the establishment of a medical monitoring trust fund on Plaintiffs and the Class'' behalf.

## II. PARTIES

**A.     The Plaintiff and Class Representatives**

11.     The Plaintiffs and class representatives are current or previous owners of residential property, or current or previous renters of residential property who have lived in the affected area in the State of New York for at least one (1) year.

12.     Plaintiffs Dolly and Robert Salerno (together, the "Salernos") reside in Niagara Falls, New York. The Salernos have lived at 1044 100th Street, Niagara falls, New York, for approximately twenty-three (23) years.  They purchased the home in 1994.  The Salernos are citizens of the State of New York.

13.     Plaintiff Diane Amantia resides in Niagara Falls, New York.   Mrs. Amantia has lived at 1348 99th Street, Niagara falls, New York, for approximately fifteen (15) years.  Mrs. Amantia purchased the home in 2002.  Mrs. Amantia is a citizen of the State of New York.

**B.     The Defendants**

14.     Defendant, CITY OF NIAGARA FALLS ("CITY"), is a municipality subject to the authority of New York statutes, located in Niagara County, New York, with offices at 745 Main Street, Niagara Falls, New York  14301.

15.     Defendant, NIAGARA FALLS WATER BOARD ("NFWB"), is a public benefit corporation created by a special act of the New York Legislature located in Niagara County, New York, with offices at 5815 Buffalo Avenue, Niagara Falls, New York  14304.

4

16.     Defendant, OCCIDENTAL CHEMICAL CORPORATION ("OXY"), individually and as Successor in Interest to HOOKER CHEMICAL AND PLASTICS CORPORATION ("OCCIDENTAL/HOOKER"), is a wholly-owned subsidiary of Occidental Petroleum Corporation headquartered at 5005 LBJ Freeway, Dallas, Texas 75244-9050.

17.     Defendant, OCCIDENTAL PETROLEUM CORPORATION, individually and as Successor in Interest to HOOKER CHEMICAL AND PLASTICS CORPORATION ("OCCIDENTAL/HOOKER"), is a foreign corporation authorized to do business in the State of New York, with principal offices at 5 Greenway Plaza, Suite 110, Houston, Texas, 77046.

18.     Defendant GLENN SPRINGS HOLDINGS, INC. ("GSH") is a corporation organized under the laws of the State of New York, with principal offices at 5005 LBJ Freeway, Dallas, Texas 75244-9050, and is a wholly owned subsidiary of Defendant OCCIDENTAL/HOOKER.

19.     Defendant GHD SERVICES INC., Individually and as Successor in Interest to CONESTOGA ROVERS & ASSOCIATES  ("GHD") is a foreign corporation authorized to do business in the State of New York, with offices at 2055 Niagara Falls Blvd., Niagara Falls, New York, 14304.

20.     Defendant MILLER SPRINGS REMEDIATION MANAGEMENT, INC. ("MSRM") is a corporation organized under the laws of the State of Delaware and registered to conduct business in the State of New York, with principal offices at 5 Greenway Plaza Houston, Texas, 77046.  Defendant MILLER SPRINGS REMEDIATION MANAGEMENT, INC. is a subsidiary of Defendant OCCIDENTAL PETROLEUM CORPORATION.

21.     Defendant SEVENSON ENVIRONMENTAL SERVICES, INC. ("SES") is a New York domestic corporation, with corporate offices located at 2749 Lockport Road Niagara Falls, New York, 14305.

22.     Defendant GROSS PHC, LLC, is a limited liability company organized under the laws of the State of New York, with corporate offices located at 2104 Niagara Street, Niagara Falls, New York, 14303. Defendant GROSS PHC, LLC ("GROSS PHC"),  individually and as successor-in-interest to GROSS PLUMBING and/or GROSS CONTRACTING is a limited liability company organized under the laws of the State of New York. GROSS PHC was incorporated in or about February 2012. At such time, upon information and belief either: (i) GROSS PHC expressly assumed the liabilities of GROSS PLUMBING and/or GROSS CONTRACTING, (ii) there was a consolidation and/or merger of GROSS PHC and GROSS PLUMBING, and/or a consolidation and/or merger of GROSS PHC and GROSS CONTRACTING, or (iii) GROSS PHC was a mere continuation of GROSS PLUMBING and/or GROSS CONTRACTING. Upon information and belief GROSS PHC was formed in or about February 2012, for the purpose of continuing the operations of GROSS PLUMBING and GROSS CONTRACTING while GROSS PLUMBING owner John Gross, Jr. served thirty-three month sentence in federal prison for bid-rigging and tax-evasion charges committed in connection with his operation of GROSS CONTRACTING.  GROSS PHC is a mere continuation of GROSS PLUMBING and/or GROSS CONTRACTING because, *inter alia,* the new business continued the operations of GROSS PLUMBING and/or GROSS CONTRACTING continued to operate out of the same offices occupied by GROSS CONTRACTING and/or GROSS PLUMBING (at 2104 Niagara Street, Niagara Falls, N.Y.), and continued to employ the more than 50 employees of the predecessor entities.

23.     Defendant DAVID GROSS CONTRACTING CORP. is a New York domestic corporation organized under the laws of the State of New York, with corporate offices located at 2104 Niagara Street, Niagara Falls, New York, 14303.

24.     Defendant GROSS PLUMBING AND HEATING CO., INC. is a New York domestic corporation organized under the laws of the State of New York, with corporate offices located at 723 16th Street, Niagara Falls, New York, 14301.

25.     Defendant NRC NY ENVIRONMENTAL SERVICES, INC., Individually and as Successor in Interest to OP-TECH ENVIRONMENTAL SERVICES is a foreign business corporation authorized to do business in the State of New York, with offices at 3500 Sunrise Highway, Building 200, Suite 200 Great River, New York, 02038.

26.     Defendant ROY'S PLUMBING, INC. is a New York domestic corporation organized under the laws of the State of New York with corporate offices at 140 Cooper Ave., Tonawanda, New York, 14150.

27.     Defendant SCOTT LAWN YARD, INC. is a New York domestic corporation organized under the laws of the State of New York, with corporate offices at 5552 Townline Road, Sanborn, New York, 14132.

28.     The term "Defendant" or "Defendants" refers to all Defendants named herein jointly and severally.

29.     Upon information and belief, each of the Defendants are responsible, negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and caused and continue to cause injuries and damages legally thereby to Plaintiffs and the Class, as alleged, either through each Defendant's own conduct or through the conduct of their agents,

servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

## III. JURISDICTION

30.     This Court has personal jurisdiction over the Defendants as each of them, for the events and happenings referred to herein, were citizens of New York State; were doing business in New York and/or owned property in New York, such that it is reasonably foreseeable that they would be subject to the jurisdiction of the courts of this state.

31.     The Plaintiffs have complied with all conditions precedent prior to bringing an action against a government entity by submitting Notice of Claims, individually, and on behalf of all other persons similarly situated, pursuant to New York General Municipal Law § 50-e and §50-h.

32.     Plaintiffs have properly served the CITY and the NFWB in compliance with New York General Municipal Law § 50-e and §50-h, and hearings were demanded and conducted by CITY for the named Plaintiffs.

## IV. VENUE

33.     This case is properly venued in this Court because the actions of the Defendants or their predecessors, and the injuries and damages alleged herein all occurred in the County of Niagara, New York.

34.     Venue is proper in the Western District of New York pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C § 1391(b) because the actual and threatened endangerments, releases, injuries, and damages at issue are taking place and have taken place in this district.

<u>V. FACTUAL ALLEGATIONS AS TO ALL COUNTS</u>

**A.     Introduction**

35.     Defendants are individually and collectively responsible for callously, wrongfully, and dishonestly exposing Plaintiffs to a host of deadly chemicals which, upon information and belief, include, but are not limited to, benzene hexachloride (the main component of the pesticide lindane, a neurotoxin), chlorobenzenes (used in the synthesis of DDT), Bis(2-ethylhexyl)phthalate (commonly known as DEHP), and dozens of other toxins, many of which Defendants knew or should have known were toxic.

36.     Among other chemicals to which there was wrongful exposure is 2,3,7,8-tetrachlorodibenzo-p-dioxin, commonly called dioxin, which is a byproduct of trichlorophenol manufacture and among the world's most carcinogenic chemicals.

37.     All of these chemicals are known or believed to be reproductive toxins, carcinogens, teratogens, and/or otherwise harmful to the human body.

38.     Some of the Plaintiffs are children who were exposed to these harmful chemicals in utero or during their childhood, at a time when they were and remain particularly vulnerable to the dangerous effects of toxic insult.

39.     All Plaintiffs have been exposed to toxins known to inflict cancers and/or other latent diseases and injuries, and also known to adversely impact reproductive capacity.

40.     As a result of the foregoing, each Plaintiff also suffers from the emotional distress associated with, *inter alia*, their individual illnesses, their prospective and/or latent illnesses, the illnesses of their family members, the prospective loss of their family members, and the economic turmoil that Defendants' conduct has caused.

B.     **The Love Canal Tragedy**[1]

41.    The Love Canal Site includes a 3,200 feet by 80 feet canal section (one of two discontinuous sections) that was excavated by William T. Love in the late 1800s for a proposed direct current hydroelectric power project. Subsequently, Mr. Love abandoned this project upon the availability of alternating current electric power. Between 1942 and 1952, the Hooker Chemicals & Plastics Corporation (now Occidental Chemical Corporation) disposed of approximately 22,000 tons of drummed and liquid chemical wastes, including polycyclic aromatic hydrocarbons (PAHs), halogenated organics, pesticides, chlorobenzenes and trichlorophenols containing 2,3,7,8-tetrachlorodibenzo-p-dioxin (TCDD or dioxin), into the abandoned canal originally excavated by Mr. Love. This abandoned canal is now identified as the original Love Canal disposal area.

42.    The CITY disposed of municipal wastes at the site from 1953 to 1954, after which time dumping ceased and the site was covered.

43.    Various studies, conducted at this time, verified that numerous toxic chemicals had migrated into the surrounding area directly adjacent to the original disposal area. Dioxin and other contaminants also migrated from the original disposal area to the sanitary and storm sewers which extended beyond the boundary of the original disposal area; some had outfalls into nearby Black, Bergholtz and Cayuga creeks, as well as the Niagara River.

44.    In 1978, NYSDOH identified more than 80 chemicals in the original disposal area and adjacent soils. Subsequently, in order to define the Site further, homes which directly abutted the original disposal and those across the street from them were identified as the Rings I and II homes, respectively.

---

[1] Paragraphs 26 – 51 are in substantial part restated from the Five-Year Review Report Love Canal Superfund Site, USEPA, January 15, 2014, available at: https://semspub.epa.gov/work/02/240086.pdf

45.     In August 1978, further sampling prompted the New York State (NYS) Commissioner of Health to order the closure of the 99th Street School and to recommend that pregnant women and children under two years of age who lived in the Rings I and II homes immediately evacuate the area and that residents avoid the use of their basements as much as possible and avoid consuming home-grown produce.

46.     Also, in August 1978, President Carter issued the first of two emergency declarations at the Site. The first emergency declaration provided Federal funding for remedial work to contain the chemical wastes at the Site and for the relocation of the residents living in Rings I and II.

47.     In May 1980, President Carter issued the second emergency declaration at the Site, which specifically established the boundaries of the Emergency Declaration Area ("EDA") and authorized $20 million of federal funds for the purchase of homes for those residents who were evacuated and/or who wanted to leave. The Federal Emergency Management Agency (FEMA) disbursed these funds and, together with the New York State Department of Environmental Conservation (NYSDEC), relocated hundreds of the affected families. Eventually, after further evacuation, an eight-foot-high chain-link fence was installed around the original disposal area and the Rings I and II homes. All but two families within Rings I and II were evacuated. After the evacuation, demolition equipment was mobilized to the Site, and the Rings I and II vacant houses were demolished. The resulting nonhazardous debris materials were either placed under the cap or used as fill on-site. Overall, approximately 950 families, of the more than 1,050 families affected, were eventually evacuated.

48.     In addition, in 1980, a 22-acre clay cap, with a minimum three-foot thickness, was installed over the original disposal area after a barrier drain collection system was installed to intercept and to collect any chemicals that were migrating from the area.

49.     In 1978, after NYSDEC and NYSDEC had requested EPA technical assistance at the Site, the EPA and NYSDOH sampled indoor air, stream sediments, biota, soils, groundwater and surface water. NYSDOH also sampled sumps, and the EPA evaluated ambient air and storm sewers around the original disposal area. This additional sampling showed significant chemical contamination in Rings I and II homes adjacent to the original disposal area.

50.     In July 1982, the EPA issued a Decision Memorandum: Cooperative Agreement with the State of New York for Love Canal ("1982 DM"). The 1982 DM documented the remedial activities that had been previously performed by NYSDEC, approved additional Federal funding and identified a phased approach for conducting eight additional tasks for the Site, which included, *inter alia*, the following:

    a)   Undertake Site containment via an expanded leachate collection system and/or other containment option;

    b)   Investigate and remediate contamination in the north end storm and sanitary sewer system;

    c)   Investigate and remediate contamination in Black and Bergholtz creeks;

    d)   Investigate and remediate contamination in the south end storm sewers;

    e)   Investigate and remediate contamination in the western sanitary sewers and lift stations; and

    f)   Develop long-term monitoring to ensure the effectiveness of the cleanup activities;

12

51.     The EPA issued the 1985 ROD with a selected remedy to remediate the sediments in the sewers and the creeks in the EDA. The selected remedy for this ROD included, *inter alia*, the following:

a) Hydraulically cleaning the sewers;

b) dredging and hydraulically cleaning the Black Creek culverts; and

c) Removing Black and Bergholtz creeks' sediments with dioxin concentrations exceeding one ppb.

52.     In 1994, Occidental Chemical Corp. ("OXY") agreed to a settlement of the claims of the State of New York. Under an Order on Consent approved by a NYS court, OXY became responsible for the continued operation and maintenance (O&M) of the Love Canal Treatment Facility ("LCTF") and the cap and appurtenances, including the functionality of 'the monitoring wells and piezometers and the sampling and analysis of the groundwater.

53.     Between 1978 and 1982; a number of remedial cleanup measures were conducted at the Site by NYSDEC and its contractors. As indicated above, these early remedial activities were formally memorialized and documented by the EPA in its 1982 DM which, as discussed above, identified further necessary remedial tasks to be conducted. These future cleanup measures were specified in the RODs which were issued for the Site subsequent to the EPA's 1982 DM.

54.     In 1985, a second and expanded engineered 40-acre cap consisting of a 40-millimeter high density polyethylene liner was installed over the already existing clay cap to further reduce infiltration of precipitation. Additionally, approximately 18 inches of clean soil and vegetation were installed over the 40-acre cap to create the present configuration. The overall fenced Love Canal Landfill ("LCL") area is 70 acres and includes a vegetated buffer zone outside of the boundaries of the 40-acre cap.

55.     The remediation of the contaminated sewers was performed during 1986 and 1987. A total of 68,000 line-feet of storm and sanitary sewers were cleaned of contaminated sediments. An onsite facility was constructed to dewater the sewer sediments. From 1987 until 1989, Black and Bergholtz creeks were dredged of approximately 14,000 cubic yards of sediments. An on-site facility was constructed to dewater the creek sediments. Subsequently, clean soils and riprap were placed in the creek beds, and the banks were replanted with grass. These remedial actions conformed to the selected remedy of the 1985 ROD which required the removal of dioxin contaminated sediments from the creeks and the sewers. Some additional sewer cleanup work was completed in 1987. The creek work is documented in the Final Engineering Report-Love Canal Black and Bergholtz Creeks Remediation, October 1990.

56.     In October 1978, remedial operations first began at the Site with the installation of a barrier drain along the east and west sides of the south section of the original Love Canal disposal area. The barrier drain was later extended to completely encompass the 40-acre capped landfill. The barrier drain, designed to intercept the shallow lateral groundwater flow, consists of a trench that is 12 to 25 feet deep and four feet wide. Within the trench are six-inch and eight-inch diameter perforated clay tile drains, centered in two feet of uniformly sized stone, which is overlain to the surface with twenty-five lateral trenches filled with sand were excavated perpendicular to the barrier drain in the direction of the LCL. The tile drain is graded toward a series of manholes and wet wells where the leachate is to be collected. The wet well collection system consists of two sectors, the North/Central Collection System and the Southern Collection System. The leachate is then pumped from the wet wells to two underground holding where it is held prior to being treated at the on-site treatment facility and subsequently discharged into the Niagara Falls sanitary sewer system.

57.     In April1995, responsibility of the O&M of the Site was transferred from NYSDEC to OXY.

58.     Until July 1, 1998, OXY's affiliate, Miller Springs Remediation Management, carried out the day-to-day operations at the Site. Since July 1, 1998, OXY's responsibility at the Site has been carried out by Glenn Springs Holdings, Inc., a subsidiary of Occidental Petroleum Corporation. Glenn Springs contracted with Conestoga Rovers & Associates to perform the daily operations.

59.     Upon information and belief, Defendants knew or should have known that Love Canal waste was not contained and migrating off of the site and into the sewer system into the residential area.  In 2011 that knowledge could no longer be covered up.

**C.     The Colvin Boulevard Sewer Release –Another Community Exposure**

60.     On or about January, 2011, the Niagara Falls Water Board ("NFWB") was performing sanitary sewer repair work in the EDA in the area of 96th Street and Colvin Boulevard in Niagara Falls, NY.  During the course of this sewer line repair, the contractor encountered what was eventually determined to be some residual contamination which had migrated from the original Love Canal disposal area.  A few homeowners in the area were concerned about this finding and questioned the effectiveness of the containment system. As a result, the EPA and NYSDEC performed follow-up work to assess the finding of contamination.

61.     In early January 2011, the NFWB initiated repairs to the Colvin Boulevard sanitary sewer east of 96th Street within EDA. These repairs were part of a larger project being implemented by the NFWB throughout Niagara Falls as part of its overall sewer project to improve the conditions of the sewer piping and to reduce groundwater infiltration into the sewers. At the location of the repair work, NFWB 's contractor was in the process of replacing a section of the sewer in order to eliminate a low spot when a chemical odor at approximately 20 feet below the ground surface was

encountered. The contractor ceased the excavation work and secured the area. Since the repair work was within the former EDA, Glenn Springs, GHD, the EPA, NYSDEC and NYSDOH were notified of the activity.

62.     Sewers in the EDA neighborhoods had been in place as early as the 1950s and, as described earlier, the investigation and subsequent flushing of these sewer lines of contaminated sediments was one component of the remedial action for the Site. Based on visual observations of the trench, it was apparent that, over time, the piping had settled into the bedding material, and the joints had become compromised allowing materials to seep out of the pipes. The sewer bedding surrounding the pipe had been impacted by historical materials that appeared to have NAPL consistency.

63.     Another NFWB contractor  analyzed the soils/sediments that had been placed in a roll-off container for volatile organic compounds (VOCs) and semi-VOCs (SVOCs), including any LCICs. In order to be protective and proactive, Glenn Springs and GHD inspected thy excavation site and immediately began a review of the current operations of the LCTF to determine if Site operations could potentially have had an impact on the section of sewer being repaired. GHD also conducted an historical search of Love Canal activities to determine if any activities had taken place in and around this sanitary sewer area. Glenn Springs and GHD found no evidence of any such activities conducted in that area.

64.     In late January 2011, Glenn Springs and GHD met with representatives from Niagara Falls, the NFWB, the EPA, NYSDEC and NYSDOH to present the preliminary results of the investigation, to address any contaminants found and to identify plans to replace the 50-foot section of sewer line.

65.     In February 2011, Glenn Springs replaced the 50-foot section of the sewer on Colvin Boulevard between 96th and 97th streets, conducted the cleanup of the sewer trench, removed sediments from within the Colvin Boulevard sewer from 97th Street to the 91st Street lift station and conducted a video inspection of the sewer line.

66.     By March 2011, Glenn Springs completed the cleanup and submitted a final report, Sanitary Sewer Investigation and Remediation Report, to Niagara Falls, the NFWB, the EPA, NYSDEC and NYSDOH which identified the activities that Glenn Springs and GHD had performed during the cleanup of the sewer, including the following:

a) Replaced approximately 50 feet of sanitary sewer beneath Colvin Boulevard between 97th and 96th Streets;

b) Removed impacted soil materials down to bedrock (22-foot depth) to the extent possible from within the sewer trench;

c) Removed liquids from the excavation, which included sanitary sewer wastewater and an amount of NAPL;

d) Hydraulically cleaned the sanitary sewer beneath Colvin between 97th Street at the 91st Street lift station;

e) Conducted a video inspection of the sanitary sewer from 97th Street to the 91st Street lift station to verify the sewer was free of sediment;

f) Restored the Colvin Boulevard road surface; and

g) Performed continuous air monitoring of the excavation area during all intrusive repair activities to monitor for worker safety. In addition, air monitoring was performed at the perimeter of the work zone at 1-hour intervals to ensure the safety of the residents of the neighborhood.

17

67. The EPA Five Year Report concluded – based on reports from Glenn Springs - that the contamination found at the Colvin Boulevard repair area was not the result of recent migration from the Site nor was it the result of a failure of the containment remedy. Rather, the likely source was an isolated pocket of historical contamination in the sewer line bedding material outside of the fenced area that had not been addressed during the Site sewer cleanup work.

68. Analytical sampling of soil and sediment at the Colvin Boulevard Release taken in January, 2011, indicated the presence of the following chemicals in and/or around the release site[2]:

a) Benzene

b) Monochlorobenzene

c) cis-1,2-Dichloroethene

d) 1,2-Dichlorobenzene

e) 1,4-Dichlorobenzene

f) 1,2,4-Trichlorobenzene

g) Toluene

h) Hexachlorobenzene

i) Hexachlorobutadiene

69. Defendant Scott Lawn Yard was contracted by the NFWB to excavate and replace the sewer at Colvin Boulevard and was responsible for the initial discovery of toxic chemicals at the Colvin Boulevard Release Site. Defendant Glenn Springs Holdings, Inc. performed the remediation of the Colvin Boulevard Release site and retained Defendants Op-Tech and Roy's Plumbing to undertake the sewer cleaning and replacement aspects of the remedial activity.

---

[2] Sanitary Sewer Investigation and Remediation Colvin Boulevard and 96th Street, Glenn Springs Holdings, Inc. March, 2011.  Available at: http://www.dec.ny.gov/docs/regions_pdf/colvinreport.pdf

70.     The CITY was the owner and operator of the storm water and sanitary sewer system that serviced and runs through the Love Canal area. On information and belief, the sewer system was transferred to the NFWB in or about April, 2003.

**D.      The Contaminants**

71.     The following compounds have been documented as being present at the Love Canal Landfill and/or the Colvin Boulevard Sewer Release:

a)   Aldrin is an extremely hazardous (pursuant to 42 U.S.C. 11002) organochlorine insecticide that was derived from hexachlorocyclopentadiene, a persistent organic pollutant.  It was banned in the 1970s.

b)   Arsenic is identified by the World Health Organization (WHO), the Department of Health and Human Services (DHHS), and Environmental Protection Agency (EPA) as a human carcinogen.   Exposure to even low levels of Arsenic is known to lead to adverse human health effects.    Arsenic increases the risk of lung, skin, bladder, liver, kidney and prostate cancers.

c)   Barium is a metal that can be found in the environment. Small amounts of water-soluble barium may cause breathing difficulties, increased blood pressure, heart rhythm changes, stomach irritation, muscle weakness, changes in nerve reflexes, swelling of brains and liver, kidney and heart damage.

d)   Benzo-trichlorides are classified as extremely hazardous substances (pursuant to 42 U.S.C. 11002) and have been classified as a Group B2, probable human carcinogen. The substance may have effects on the lungs, liver, kidneys and thyroid.

e)   Cadmium is a known human carcinogen. It is an extremely toxic metal commonly used in electroplating.  Cadmium exposure may also effect lungs and kidneys, resulting in kidney impairment.

f)   Caustics are chemicals that are capable of burning or corroding by chemical action.

g)   Chlorobenzenes are irritating to the eyes and the skin and may cause central nervous system effects. Animal reproduction studies on Chlorobenzene have shown an adverse effect on the fetus.

19

h) Chlordane is an extremely hazardous substance (pursuant to 42 U.S.C. 11002) and has been classified as a Group B2, probable human carcinogen. It was used as a pesticide in the United States from 1948 until it was banned in 1988.   Chlordane exposure is a risk factor for type-2 diabetes, prostate cancer, testicular cancer and breast cancer.

i) Chromium used in electroplating and chemical manufacture and may cause   heritable genetic damage to human germ cells and effect human reproduction or development. It can cause skin rashes, ulcers, weakened immune systems, kidney and liver damage, and Lung cancer.

j) Dieldrin is considered by NIOSH to be a potential occupational carcinogen. Dieldrin accumulates in the body cause possible cumulative  effects.

k) Hexachlorocyclohexane is a possible human carcinogen.  It may effect the central nervous system, bone marrow, liver, sex hormones and genital system. Animal tests show that this substance possibly causes toxic effects upon human reproduction.

l) Lindane is an extremely hazardous substance (pursuant to 42 U.S.C. 11002) and is a neurotoxin that may cause effects on the central nervous system. Lindane exposure may result in death. Tumors have been detected in experimental animals indicating that it may have effects on the liver in humans.

m) Lead affects almost every organ and system in the human body; it can damage organs, cause permanent developmental disabilities, seizures, coma, and even death. Lead exposure has its strongest effect on children and child brain development. Children exposed to even low levels of lead often develop difficulties learning, and if the exposure does not stop, the damage will continue and is permanent.  The Centers for Disease Control (CDC) has determined that no safe blood lead level in children has been identified.[3]

n) Mercury exposure can cause brain, kidney, and lung damage and may seriously harm a developing fetus. Exposure to even low levels of airborne mercury for prolonged periods of time can cause irritability, sleep disturbances, excessive shyness, tremors, coordination problems, changes in vision or hearing, and memory problems.

---

[3] See: http://www.cdc.gov/nceh/lead/

o) Petroleum products, including hexane, benzene, toluene, xylenes, naphthalene, and fluorine, may cause damage to the lungs, central nervous system, liver, and kidneys. Some petroleum compounds have also been shown to affect reproduction and the developing fetus in animals. Benzene is a known human carcinogen.

p) Phenol is an extremely hazardous substance (pursuant to 42 U.S.C. 11002) and can cause respiratory irritation, headaches, and burning eyes. People who had skin exposure to high amounts of phenol had skin burns, liver damage, irregular heart beat, and some died. Ingestion of high concentrations of phenol has resulted in internal burns and death.

q) PAHs.  The Centers for Disease Control and Prevention characterize PAHs as probable carcinogens, associated with risk of lung, genitourinary, and skin cancers.

r) PCBs are an odorless group of volatile synthetic organic chemicals and are either oily liquids or solids.  PCBs enter the environment as mixtures containing a variety of individual chlorinated biphenyl components, known as congeners, as well as impurities.

s) Once released into the environment, PCBs do not readily break down and therefore remain for long periods of time cycling between air, water, and soil.

t) PCBs have been demonstrated to cause cancer, as well as a variety of other adverse health effects on the immune system, reproductive system, nervous system, and endocrine system. The manufacture of PCBs was stopped in the U.S. in 1977 because of evidence they build up in the environment and can cause harmful health effects.

u) Upon information and belief, all the above-referenced contaminants (hereinafter "the Contaminants") , and their derivatives, in amounts and concentrations above State and Federal residential safety levels, were and continue to be released, discharged, and disbursed throughout the Love Canal area from the Site and through the storm water and sanitary sewer systems.

v) The contamination has been allowed to migrate onto Plaintiffs' and Class Members' properties, causing Plaintiffs and the Class to suffer ongoing injuries, including significant health impairments and damage to their properties, as well as putting them at high risk for future, latent diseases and cancers.

21

## E.    Documented Health Effects from Love Canal Chemicals

72.    In its September 1978 report to the State Legislature, the New York State Department of Health noted that:

> data analyzed to date seems to suggest that the risk for miscarriages and birth defects might be localized in 99th Street, particularly in the southern section. Researchers are now examining the possibility that this phenomenon may be related to the higher concentration of benzene (a known inhibitor of cell division) found in the southern Canal section. Based on preliminary epidemiologic investigations, the Commissioner of Health recommended immediate relocation of all pregnant women and all children under two years of age from the Love Canal area. He also ordered delayed opening of the 99th Street elementary school which is situated in the central Love Canal section.[4]

73.    The NYSDOH report further noted the following list of chemicals identified at the Love Canal site and the human biologic hazards associated with them.

| Compound | Acute Effects | Chronic Effects |
|---|---|---|
| benzene | Narcosis<br>Skin irritant | Acute leukemia, Aplastic anemia<br>Pancytopenia, Chronic lymphatic leukemia<br>Lymphomas (probable) |
| toluene | Narcosis (more powerful<br>than benzene) | Anemia (possible)<br>Leukopenia (possible) |
| benzoic acid | Skin irritant | |
| lindane | Convulsions<br>High white cell counts | |
| trichloroethylene | Central nervous depression<br>Skin irritant<br>Liver damage | Paralysis of fingers<br>Respiratory and cardiac arrest<br>Visual defects, Deafness |
| dibromoethane | Skin irritant | |
| benzaldehydes | Allergen | |
| methylene chloride | Anesthesia (increased carboxy hemoglobin) | Respiratory distress<br>Death |
| carbon tetrachloride | Narcosis<br>Hepatitis<br>Renal damage | Liver tumors (possible) |
| chloroform | Central nervous narcosis<br>Skin irritant | |

---

[4] NYSDOH Report to the Legislature, Sept. 1978. Retrieved from
https://www.health.ny.gov/environmental/investigations/love_canal/lctimbmb.pdf

| | Respiratory irritant<br>Gastrointestinal symptoms | |
|---|---|---|

74.     In addition to the 1978 NYSDOS Report to the Legislature, more recent studies have examined the long-range effects of exposure to Love Canal chemicals.  The Love Canal Follow-up Health Study, conducted by NYSDOH, found that

> Women with the potential for exposure as a child and maternal residences on the Canal during pregnancy also were positively associated with a number of adverse reproductive outcomes. In general, these findings are also consistent with previous Love Canal investigations which also showed increased risks of low birth weight, congenital malformations and other adverse reproductive events among Love Canal births. Such consistency lends additional weight to the results of this investigation. [5]

75.     Moreover, there is a evidence that the toxic effects of exposure to Love Canal Chemicals may have resulted in a greater likelihood of acute myocardial infarction ("AMI") and other, seemingly accidental, causes of death:

> Assuming the observed associations of living in the EDA, with mortality from AMI, motor vehicle accidents, and suicides representing a causal relationship, one may postulate two possible pathways: a) direct cardiotoxic or neurotoxic effects leading, through biological mechanisms, to heart disease or to psychologic or behavioral symptoms; and b) indirect stress induced physiologic or psychologic reactions, including elevated blood pressure and/or injurious behavioral reactions. [6]

## F.     Defendants' Conduct

76.     Without prejudice and upon information and belief, Defendant CITY OF NIAGARA FALLS, acting knowingly and either alone or in concert, engaged in the following misconduct:

---

[5] NYSDOH, October 2008.  Retrieved from:
https://www.health.ny.gov/environmental/investigations/love_canal/docs/report_public_comment_final.pdf

[6] Mortality among Former Love Canal Residents,  Lenore J. Gensburg, et al. *Environ Health Perspect*
117:209–216 (2009). Retrieved from https://ehp.niehs.nih.gov/wp-content/uploads/117/2/ehp.11350.pdf

a) failing to properly maintain and operate the water and sewer facilities in the Love
Canal area up until 2003 (when such ownership was supposedly transferred to
Defendant Niagara Falls Water Board upon its creation);

b) failing to maintain water and sewer facilities that were free from Love Canal toxins
during its ownership and/or management of said sewers;

c) failing to adequately inspect the water and sewer facilities in the Love Canal area to
ensure that they were free of toxins;

d) failing to advise relevant government authorities of the dangerous nature of the
toxins being released from the Love Canal site and/or the surrounding sewer and
water systems;

e) allowing Love Canal toxins from sewer and water facilities under its ownership
and/or control to leach, migrate, surface, escape, and/or move onto and into the
properties of Plaintiffs;

f) failing to remediate Love Canal contamination present within the water and sewer
facilities under its ownership, care, and control;

g) negligently, recklessly, carelessly, and/or otherwise tortiously awarding contracts for
Love Canal Site remediation work to contractors which were unqualified to perform
such work;

h) negligently, recklessly, carelessly, and/or otherwise tortiously failing to terminate
such contracts for Love Canal work upon learning that such contractors were
unqualified to perform such work;

i) dumping of toxic waste at the Love Canal site;

24

j)   intentional, negligent, careless, reckless, and/or otherwise tortious failure to act after the January 11, 2011, release and/or discovery of toxic chemicals at the Colvin Boulevard trench site as alleged herein;

k)   intentionally, negligently, carelessly, recklessly, and/or otherwise tortiously leaving inactive sever channels in place, thus further contributing to the migration of contaminants away from the Love Canal Site, and onto and into the homes of Plaintiffs;

l)   failing to advise area residents, including Plaintiffs, of the dangerous nature of their exposure to Love Canal toxins as a result of CITY's systemic and longstanding practice (either individually or through agents) of installing bypass pumps at critical junctures (including but not limited to 93rd Street and Colvin Boulevard) in order to direct toxic material directly to Cayuga Creek, which also has the effect of vaporizing and/or venting such toxins into the air, and thus, Plaintiffs' homes;

m)  failing to advise area residents, including Plaintiffs, of the dangerous nature of the toxins to which they were exposed;

n)   unlawfully releasing into the environment substances hazardous to public health, safety, and/or the environment, acutely hazardous to public health, safety or the environment, and/or a hazardous waste.

77.   Without prejudice and on information and belief: Defendant NIAGARA FALLS WATER BOARD, acting knowingly and either alone or in concert, engaged in the following misconduct:

a)  failing to properly maintain and operate the water and sewer facilities in the Love
    Canal area from 2003 (when such ownership was supposedly transferred to
    Defendant Niagara Falls Water Board upon its creation) to the present;

b)  failing to maintain water and sewer facilities that were free of Love Canal toxins
    during its ownership and/or management of said sewers;

c)  failing to adequately inspect the water and sewer facilities in the Love Canal area to
    ensure that they were free of toxins;

d)  allowing Love Canal toxins from sewer and water facilities under its ownership to
    leach, migrate, surface, escape, and/or move onto and into the properties of
    Plaintiffs;

e)  intentionally, negligently, carelessly, recklessly, and/or otherwise tortiously leaving
    inactive sewer channels in place, thus further contributing to the migration of
    contaminants away from the Love Canal Site, and onto and into the homes of
    Plaintiffs;

f)  failing to remediate Love Canal contamination present within the water and sewer
    facilities under its ownership, care, and control;

g)  failing to advise relevant government authorities of the dangerous nature of the
    toxins being released from the Love Canal site and/or the surrounding sewer and
    water systems;

h)  negligently, carelessly, recklessly, and/or otherwise failure to act after the January
    11, 2011 discovery and/or further acute release of Love Canal toxins in to the
    environment (in addition to the baseline Love Canal toxins to which Plaintiffs were
    exposed prior to and after the January 11, 2011 incident);

26

i) the negligent, careless, reckless, and otherwise tortious response to the January 11, 2011 discovery and/or release of chemicals, including but not limited to the "jetting" of such toxic sediments, which further disbursed the material onto and into the Plaintiffs' homes;

j) failing to advise area residents, including Plaintiffs, of the dangerous nature of the toxins to which the) were exposed;

k) intentionally, negligently, needlessly, carelessly, or otherwise tortiously operating bypass pumps (either individually or through agents) to remove toxic sediment and other hazardous materials from area sewers in the Love Canal area and pumping said material directly into Cayuga Creek, thus further exposing area residents (including Plaintiffs) to toxic chemicals;

l) failing to advise area residents, including Plaintiffs, of the dangerous nature of their exposure to Love Canal toxins as a result of NFWB"s systemic and longstanding practice of installing bypass pumps at critical junctures (including but not limited to 93rd Street and Colvin Boulevard) in order to direct toxic material directly to Cayuga Creek, which also has the effect of vaporizing and/or venting toxins into the air, and thus, Plaintiffs homes;

m) unlawfully releasing into the environment substances hazardous to public health, safety, and/or the environment, acutely hazardous to public health, safety or the environment, and/or a hazardous waste.

78. Without prejudice and upon information and belief, Defendant OCCIDENTAL/HOOKER, acting knowingly and either alone or in concert, engaged in the following misconduct:

27

a) dumping approximately 21,000 tons of toxins at the Love Canal Site;

b) intentional negligent, careless, reckless, and/or otherwise tortious conduct in connection with the initial remediation of the toxins it had dumped at the Love Canal site;

c) intentional, negligent, careless, reckless, and/or otherwise tortious conduct in connection with the ongoing maintenance, monitoring, and/or oversight of the Love Canal Site and surrounding area from in or about 1995 (when control of the Love Canal Site was transferred to OCCIDENTAL/HOOKER) and continuing to the present day;

d) failing to ensure that toxins were not leaching, migrating, surfacing, escaping, and/or moving from within the Love Canal containment system following its construction and continuing to the present day;

e) failing to report to relevant authorities and/or the public that toxins were escaping from the Love Canal containment system following its construction and continuing to the present day;

f) failing to ensure that the area sewers and/or water systems and/or utility corridors were free from Love Canal contamination;

g) failing to report to relevant authorities and/or the public that Love Canal toxins were and are present within area sewers and/or water systems and/or utility corridors;

h) failing to advise area residents, including Plaintiffs, of the dangerous nature of the toxins to which they were exposed beginning from the time of the initial dumping of toxins at Love Canal and continuing to the present;

i)   unlawfully releasing and allowing to escape and/or migrate into the environment substances hazardous to public health, safety, and/or the environment, acutely hazardous to public health, safety or the environment, and/or a hazardous waste;

j)   failing to properly investigate the potential negative health effects of the chemicals that it had dumped on the Love Canal site in the 1940s and 1950s, despite its early recognition and understanding of the dangers posed by the chemicals that it had improperly dumped at the Love Canal Site;

k)   failing to advise relevant government authorities of the dangerous nature of the toxins being released from the Love Canal site and/or the surrounding sewer and water systems;

l)   failing to adequately monitor the actual effects of the chemicals that it had wrongfully dumped at Love Canal on the surrounding neighborhood, including but not limited to adverse health effects such as those suffered by Plaintiffs, as well as the contamination of the surrounding soil, water, and air;

m)   failing to consider the particular local geography and geology in evaluating the effects or likely effects of the chemicals that it had improperly disposed at the Love Canal site;

n)   making false, misleading, and deceptive statements to the public at large, as well as to relevant governmental agencies, concerning the Love Canal site, including but not limited to statements concerning the toxins which it had dumped on the land and the safety and/or contamination of the neighborhoods surrounding the Love Canal site;

o)   concealing information from and failing to warn the public at large, as well as relevant governmental agencies, concerning the Love Canal site, including but not

limited to information concerning the toxins which it had dumped on the land and the safety and/or contamination of the neighborhoods surrounding the Love Canal site;

p) failing to issue appropriate warnings concerning the likely environmental and public health implications of its conduct, when it knew or should have known of the growing development of medical and scientific knowledge concerning the toxicity and/or harmful medical effects of substances it had dumped on the Love Canal Site;

q) failing to continuously monitor and warn the Niagara Falls school board of the dangers posed by the material it had dumped on the Love Canal site, when it knew or should have known that a school had been constructed on the site;

r) failing to continuously monitor and warn the neighborhood residents (including Plaintiffs) of the dangers posed by the materials it had dumped on the Love Canal Site, when it knew or should have known that a residential community was being developed in dangerously close proximity to the land on which it had dumped 21,000 tons of toxins.

79.    Without prejudice and on information and belief, Defendant Glenn Springs Holdings, Inc., (GSH)  acting knowingly and either alone or in concert, engaged in the following misconduct:

a) since approximately 1995 and continuing to the present negligently, recklessly, carelessly, or otherwise tortiously executing its duties of operation, maintenance, and monitoring (OM&M) of the Love Canal Site, including but not limited to: (i) groundwater monitoring at various wells on or around the site; (ii) groundwater elevation measurement at piezometers located around the site; (iii) operation and

maintenance of the leachate collection and treatment system; and.(iv) an annual performance assessment of the leachate Collection and treatment facility and the barrier drain system;

b) failing to ensure that there is no off-site migration of chemical contaminants from the Love Canal Site;

c) failing to report the off-site migration of chemical contaminants from the Love Canal Site;

d) failing to advise relevant government authorities of the dangerous nature of the toxins being released from the Love Canal site, and/or the surrounding sewer and water systems;

e) negligent, careless, reckless, and otherwise tortious conduct relating to the January 11, 2011, release and/or discovery of toxins from the Colvin Trench, including but not limited to the following activities: (i) replacing the broken 50-foot sanitary sewer section. (ii) cleaning the sanitary sewer from 97th Street to 91st Street, and (iii) cleaning the 91" Street lift station;

f) failing to advise area residents, including Plaintiffs, of the dangerous nature of the toxins to which they were exposed;

g) failing to routinely and/or adequately monitor the air, soil, or surface water in and around the Love Canal Site;

h) unlawfully releasing into the environment substances hazardous to public health, safety, and/or the environment, acutely hazardous to public health, safety or the environment, and/or a hazardous waste.

80.   Without prejudice and on information and belief Defendant GHD SERVICES INC., Individually and as Successor in Interest to CONESTOGA ROVERS & ASSOCIATES, acting, knowingly and either alone or in concert, engaged in the following misconduct:

    a)   Negligently, carelessly, recklessly, or otherwise tortiously performing OM&M and reporting activities at the Love Canal Site (under GSH's direct management and/or control);

    b)   negligently, recklessly, carelessly, or otherwise tortiously performing services on behalf of GSH in the response to the January 11, 2011 incident at the Colvin Trench Site;

    c)   failing to advise area residents, including Plaintiffs, of the dangerous nature of the toxins to which they were exposed;

    d)   failing to advise relevant government authorities of the dangerous nature of the toxins being released from the Love Canal site and/or the surrounding sewer and water systems;

    e)   failing to routinely and/or adequately monitor the air, soil or surface water in and around the Love Canal Site;

    f)   unlawfully releasing into the environment substances hazardous to public health, safety, and/or the environment acutely hazardous to public health, safety or the environment and/or a hazardous waste.

81.   Without prejudice, and on information and belief MILLER SPRINGS REMEDIATION MANAGEMENT, INC., acting knowingly and either alone or in concert, engaged in the following misconduct:

a)  from on or about July 1998 until on or about October 1, 2008 (when GSH transferred OM&M responsibility to GHD), intentionally, negligently, carelessly, recklessly, or otherwise tortiously performed OM&M and reporting activities at the Love Canal Site (under GSH's direct management and/or control);

b)  failing to routinely and/or adequately monitor the air, soil, or surface water in and around the Love Canal Site;

c)  intentionally, negligently, recklessly, carelessly, or otherwise tortiously performing services on behalf of GSH in the response to the January 11, 2011, incident at the Colvin Trench Site;

d)  failing to advise area residents, including Plaintiffs, of the dangerous nature of the toxins to which they were exposed;

e)  failing to advise relevant government authorities of the dangerous nature of the toxins being released from the Love Canal site and/or the surrounding sewer and water systems;

f)  unlawfully releasing into the environment substances hazardous to public health, safety, and/or the environment, acutely hazardous to public health, safety or the environment, and/or a hazardous waste.

82.   Without prejudice and on information and belief SES, acting knowingly and either alone or in concert, engaged in the following misconduct:

a)  intentionally, negligently, carelessly, recklessly, or otherwise tortiously undertaking responsibility as a principal contractor for the initial remediation work at Love Canal, despite historically being a contracting company and never previously having been involved in an environmental remediation project;

b) negligently, carelessly, recklessly, or otherwise tortiously performing its duties to implement the pollution abatement plan for the Love Canal site;

c) utilizing substandard materials in its construction of either the leachate collection and/or the clay cap, such that toxins were not and are not contained within the Love Canal containment system;

d) negligently, carelessly, recklessly, or otherwise tortiously performing its function of excavating, handling, and disposing of extremely high concentrations of hazardous waste at the Love Canal site continuing to the present day, such that area residents (including Plaintiffs) continue to be exposed to such material;

e) negligently, carelessly, recklessly, or otherwise tortiously cleaning 12 miles of storm sewer in the Love Canal area, such that said sewers were not rendered free of Love Canal toxins;

f) intentionally, negligently, recklessly, or otherwise tortiously failing to advise area residents of the presence of Love Canal contamination in the sewers and/or other public works in the Love Canal area, despite the fact that it knew or should have known of such contamination by virtue of SES routinely performing work related to the ongoing functioning of the Love Canal containment system;

g) intentionally, negligently, carelessly, recklessly, and/or otherwise tortiously leaving inactive sewer channels in place, thus further contributing to the migration of contaminants away from the Love Canal Site, and onto and into the homes of Plaintiffs;

h) failing to adequately dean, remove, and/or dispose of toxic materials and/or sediment that it or its agents had removed from the Love Canal Site;

i)   intentionally, negligently, recklessly, carelessly, or otherwise tortiously failing to advise relevant government agcnc1es of the presence of Love Canal contamination in the sewers and/or other public works in the Love Canal area, despite the fact that it knew or should have known of such contamination by virtue of SES routinely performing work related to the ongoing functioning of the Love Canal containment system;

j)   unlawfully releasing into the environment substances hazardous to public health, safety, and/or the environment, acutely hazardous to public health, safety or the environment, and/or a hazardous waste.

83.   Without prejudice. and on information and belief GROSS defendants acting knowingly and either alone or in concert, engaged in the following misconduct:

a)   through GROSS PLUMBING and/or GROSS CONTRACTING, negligently, carelessly, recklessly, or otherwise tortiously performing inspections at homes throughout the Love Canal area. advising residents (including Plaintiffs) that their homes were safe and/or free of toxic contamination (when in fact they were not), and otherwise misleading residents (including Plaintiffs) as to the cause of the sludge present in the sewers, pipes, and sump pumps:

b)   through GROSS PLUMBING and/or GROSS CONTRACTING, negligently, carelessly, recklessly, or otherwise tortiously performing its function of cleaning the sewers in the Love Canal area (and/or representing that it had cleaned certain sewers when in fact it had not), so as to further expose area residents (including Plaintiffs) to Love Canal toxins;

    c)  through GROSS CONTRACTING, negligently, carelessly, recklessly, or otherwise tortiously performing functions relating to the Colvin Trench project as a subcontractor to Defendant SCOTT;

    d)  through GROSS, GROSS PLUMBING, and GROSS CONTRACTING, intentionally, negligently, carelessly, recklessly, or otherwise tortiously failing to report the presence of toxic and/or otherwise suspicious materials in area homes (including those of Plaintiffs) after being contracted to inspect such homes by, *inter alia*, Defendants CITY, NFWB, GSH, and GHD;

    e)  unlawfully releasing and allowing to escape and/or migrate into the environment substances hazardous to public health, safety, and/or the environment, acutely hazardous to public health, safety or the environment, and/or a hazardous waste.

84.    Without prejudice and on information and belief, NRC NY ENVIRONMENTAL SERVICES, INC., Individually and as Successor in Interest to OP-TECH ENVIRONMENTAL SERVICES (OP-TECH), acting knowingly and either alone or in concert, engaged in the following misconduct:

    a)  Intentionally, negligently, carelessly, recklessly, or otherwise tortiously performing its functions as a contractor that GSH and/or other Defendants retained to assist in completing the sewer replacement at the Colvin Trench and assist in sewer cleaning following the January 11, 2011 incident at the Colvin Trench, and continuing to the present;

    b)  Intentionally, negligently, carelessly, recklessly, or otherwise tortiously causing chemicals and toxins to be further disbursed into the environment, and onto and into Plaintiffs homes. thus causing damage to the Plaintiffs;

36

c)  as part of its engagement following the January 11, 2011 incident, intentionally.
    Negligently, carelessly, recklessly, or otherwise tortiously retaining a subcontractor
    to utilize a high-pressure "jetting"' device to clean the roadway and sewers following
    the January 11, 2011 incident, thus further disbursing toxins into the environment.
    including onto and into the homes of Plaintiffs;

d)  unlawfully releasing into the environment substances hazardous to public health,
    safety, and/or the environment, acutely hazardous to public health, safety or the
    environment, and/or a hazardous waste.

85.  Without prejudice and on information and belief, ROY's PLUMBING, acting
knowingly and either alone or in concert, engaged in the following misconduct:

a)  Intentionally, negligently, carelessly, recklessly, or otherwise tortiously performing
    its functions as a subcontractor that OP-TECH and/or other Defendants retained to
    assist in completing the sewer replacement at the Colvin Trench and assist in sewer
    cleaning following the January 11, 2011 incident at the Colvin Trench;

b)  Intentionally, negligently, carelessly, recklessly, or otherwise tortiously utilizing a
    high-pressure "jetting" device to clean the roadway and sewers following the
    January 11, 2011 incident, thus further disbursing toxins into the environment,
    including onto and into the homes of Plaintiffs;

c)  intentionally, negligently, carelessly, recklessly, or otherwise tortiously representing
    to Love Canal area residents (including Plaintiffs) that their homes were safe
    following the January 11, 2011 incident, when in fact they were not, and indeed
    ROY'S workers had observed NAPL in such homes;

d)  intentionally, negligently, carelessly, recklessly, or otherwise tortiously failing to advise Love Canal area residents (inducting Plaintiffs) that their homes were not safe following the January 11, 2011 incident, when in fact they knew or should have known that to be the case;

e)  unlawfully releasing into the environment substances hazardous to public health, safety, and/or the environment, acutely hazardous to public health, safety or the environment, and/or a hazardous waste.

86.   Without prejudice and on information and belief, SCOTT LAWN YARD acting knowingly and either alone or in concert, engaged in the following misconduct:

a)  intentionally, negligently, carelessly, recklessly, or otherwise tortiously performing its functions as a contractor retained by NFWB in early 2011 to repair and/or replace 17 existing sewer lines in the LaSalle area of Niagara Falls, N.Y., including the sewer line at the site of the Colvin Trench;

b)  intentionally, negligently, carelessly, recklessly, or otherwise tortiously causing the release of toxic chemicals from the Colvin Trench on or about January 11, 2011;

c)  intentionally, negligently, carelessly, recklessly, or otherwise tortiously failing to advise area residents (including Plaintiffs) that it would be performing work on the sewers in close proximity to Love Canal, and advising them to take precautions;

d)  intentionally, negligently, carelessly, recklessly, or otherwise tortiously failing to advise relevant government agencies that it would be performing work on the sewers in close proximity to Love Canal;

e)  intentionally, negligently, carelessly, recklessly, or otherwise tortiously undertaking the project at the Colvin Trench even though it lacked the requisite licensing,

38

training, equipment and/or expertise to work with hazardous Love Canal toxins, when in company representatives believed that toxins would be present in the Colvin Trench;

f)   unlawfully releasing into the environment substances hazardous to public health, safety, and/or the environment, acutely hazardous to public health, safety or the environment, and/or a hazardous waste.

## FACTUAL ALLEGATIONS AS TO PLAINTIFFS AND CLASS REPRESENTATIVES

87.   The Salernos regularly spent time in their yard and ingested, inhaled, and had direct dermal contact with surface and subsurface soil and materials.   The Salernos were exposed to chemical vapors in and around their home.   Subsequently Mr. Salerno was diagnosed with Cancer and Mrs. Salerno suffers from migraine headaches, dizzy spells, arrhythmia, anxiety and panic attacks. The Salernos have as a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous substances into the area surrounding his home, Mr. Salerno has developed significant debilitating personal injuries, as well as damage to his personal property.   As a result of Defendants' reckless, negligent, and grossly negligent conduct, Mr. and Mrs. Salerno have suffered and continue to suffer severe physical injury, pain, and suffering and property damage.   Mr. and Mrs. Salerno bring suit against each Defendant named herein for each cause of action listed herein and seeks general damages directly and foreseeably resulting from Defendants' actions, consequential damages, medical monitoring, and exemplary or punitive damages as allowed by law and in an amount to be proved at trial.

88.   Mrs. Amantia regularly spent time in the yard and ingested, inhaled, and had direct dermal contact with surface and subsurface soil and materials.   Mrs. Amantia and her family were

exposed to chemical vapors in and around their home.   As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous substances into the area surrounding his home, Mrs. Amantia has been exposed to toxic chemicals, putting her and her family at an increased risk of developing cancer and other ailments.   Further, Mrs. Amantia has suffered damage to her personal property.   Mrs. Amantia brings suit against each Defendant named herein for each cause of action listed herein and general damages directly and foreseeably resulting from Defendants' actions, consequential damages, medical monitoring,  and exemplary or punitive damages as allowed by law and in an amount to be proved at trial.

89.     The Plaintiff and the Class causes of action related to contamination and exposure are continuing in nature.  Plaintiffs and the Class have and continue to engage in activities on their properties that require them to come into direct contact with subsurface and surface soil.

90.     Plaintiffs and the Class were personally exposed and continue to be exposed to hazardous and toxic substances, contaminants, and pollutants from the above mentioned Site via ingestion, inhalation, and or/dermal contact, during normal day activities such as walking in the neighborhood, gardening and doing yard work, playing in their yards, as well as living in their homes.

91.     Plaintiffs and the Class are an 'exposed population' as defined in Section 6.8.1 of the ATSDR Public Health Assessment Guidance Manual as follows:

92.     A population is considered exposed if a completed exposure pathway, which links a contaminant with a receptor population, exists in the past, present, or future. An exposed population includes persons who ingest, inhale, or contact site contaminants or are exposed to radiation in the past, present, or future. Examples of exposed persons include those who:

- have ingested, are ingesting, or will ingest the contaminant from one or more environmental media;

- have inhaled, are inhaling, or will inhale the contaminant from one or more environmental media;
- have contacted, are contacting, or will contact the contaminant in one or more environmental media; and
- were exposed, are exposed, or will be exposed to gamma radiation from one or more environmental media.

93.    If an environmental medium (soil) contains a contaminant of concern at a point of exposure (a residential yard), and evidence already exists that a route of exposure (ingestion) has occurred, is occurring, or will occur, the health assessor should assume that persons living at that residence are exposed or will be exposed. If the residential yard contains a vacant house, the health assessor should assume that future residents will be exposed. Persons should also be considered exposed if exposure has been verified by human biologic measurements or medical examination. For health assessments, human biologic measurements or medical examination are not necessary for the assignment of an exposure category to a population.

CLASS ACTION ALLEGATIONS

94.    Plaintiffs and the Class incorporate the foregoing paragraphs as though the same were set forth at length herein.

95.    Plaintiffs bring this action and seek to certify  a class action pursuant to Fed. R. Civ. P. 23, on behalf of themselves and those similarly situated individuals as members of the proposed subclasses, subject to amendment and additional discovery as follows:

a.    all current and former residents of the Love Canal Area who have been exposed to the toxic contaminants, discharged or otherwise distributed by Defendants, for personal injury and to establish medical monitoring as 'reasonably anticipated' consequential damages resulting from their exposure to the aforementioned toxins (the "Bodily Injury Subclass");

b.    all Children of past or present Love Canal Area Residents that suffered in-utero, or birth-related injury from their parents' exposure (Birth Defect Subclass);

c.     all owners of real property of the Love Canal Area for damages, whose property value has been diminished due to the known or perceived contamination in the area, and/or stigmatization of property (the "Property Value Damage Subclass");

d.     all owners of real property in of the Love Canal Area, for all past, present, and future costs of remediation for the contamination of their real property, described of herein (the "Remediation Subclass");

e.     all owners of real property of the Love Canal Area, for all future costs associated with the environmental monitoring of the contamination caused by Defendants described of herein, including but not limited to soil vapor testing, sub-slab testing, and indoor air testing (the "Property Monitoring Subclass").

96.     For purposes of the Class, the "Love Canal Area" is as follows:

The Love Canal Site and surrounding area situated north of the north bank of the Niagara River, west of Williams Road, east of Niagara Thruway (Interstate 190) and south of Niagara Falls Boulevard (U.S. Route 62).

97.     Excluded from the Subclass are:

a)   Defendants, including any entity or division in which Defendants have a controlling interest, along with their legal representative, employees, officers, directors, assigns, heirs, successors, and wholly or partly owned subsidiaries or affiliates;

b)   the Judge to whom this case is assigned, the Judge's staff, and the Judge's immediate family; and

c)   all governmental entities.

98.     The Subclasses and this action satisfy the Numerosity, commonality, typicality, adequacy, predominance, and superiority requirements.  Plaintiffs reserve the right to amend the Subclass definitions if discovery and further investigation reveal that any Subclass should be expanded, divided into additional subclasses, or modified in any other way.

**NUMEROSITY AND ASCERTAINABILITY**

99.     The Subclasses are so numerous that joinder of all members is impracticable, given that the amount of affected current and former residents and property owner's in the Love Canal Area, upon information and belief, has reached over one thousand persons. While the exact number of Subclass members is not yet known, a precise number can be ascertained from U.S. Federal Census records, State of New York and Love Canal Area public records, and through other discovery.  Finally, Subclass members can be notified of the pendency of this action by Court-approved notice methods.

**PREDOMINANCE OF COMMON ISSUES**

100.    There are numerous questions of law and fact common to Plaintiffs and Subclass Members that predominate over any question affecting only individual Subclass Members, the answers to which will advance resolution of the litigation as to all Subclass Members. These common legal and factual issues include the following:

a)      whether Defendants engaged in the conduct alleged herein;

b)      whether Defendants knew or should have known that exposure to the Contaminants disposed of at the Site could increase health risks;

c)      the extent to which Defendants knew about the contamination described of herein in the Love Canal Area;

d)      whether the manner in which Defendants disposed, managed or otherwise dealt with of the Contaminants proximately caused the injuries described of herein;

e)      whether Defendants made unlawful and misleading representations or material omissions with respect to the health impacts of the Contaminants;

f)       for the Bodily Injury Subclass and Birth Defect Subclasses, whether any health issue or bodily injury of Plaintiffs and the Subclass are attributable to Defendants' actions and omissions;

g)       for the Property Value Subclass, whether property values in the Love Canal Area declined following the disclosure of the contamination described of herein; and

h)       whether Plaintiffs and Subclass Members are entitled to damages and other monetary relief, medical monitoring and punitive damages, and if so, in what amount.

<u>**TYPICALITY**</u>

101.    Plaintiffs' claims are typical of the claims of Subclass Members, and arise from the same course of conduct by Defendants. Plaintiffs' persons and real property, like all Subclass Members, have been damaged by Defendants' misconduct in that they have incurred damages and losses related to the contamination migrating from the Site, causing personal injury and property damages.  Furthermore, the factual bases of Defendants' actions and misconduct are common to all Subclass Members and represent a common thread of misconduct resulting in common injury to all Subclass Members.  The relief Plaintiffs seek is typical of the relief sought for absent Subclass Members.

<u>**ADEQUACY OF REPRESENTATION**</u>

102.    Plaintiffs will serve as fair and adequate Subclass representatives as their interests, as well as the interests of their counsel, do not conflict with the interest of other members of the Subclass they seek to represent.   Further, Plaintiffs have retained counsel competent and experienced in class action litigation.

103.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Subclasses.

## SUPERIORITY

104.    The class action mechanism is superior to any other available means of the fair and efficient adjudication of this case.  Further, no unusual difficulties are likely to be encountered in the management of this class action. Given the great amount of Love Canal Area residents impacted by Defendants' conduct, it is impracticable for Plaintiffs and the Subclasses to individually litigate their respective claims for Defendants' complained of conduct. To do so would risk inconsistent or contradictory judgments and increase delays and expense to both parties and the court system. Therefore, the class action mechanism presents considerably less management challenges and provides the efficiency of a single adjudication and comprehensive oversight by a single court.

### AS AND FOR A FIRST CAUSE OF ACTION:
### NEGLIGENCE

105.    Plaintiffs and the Subclasses re-allege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

106.    Negligence may exist both as an omission as well as an affirmative act.[7]  A cause sounding in negligence allows for the recovery for an injury that was proximately caused by another's violation of a duty of reasonable care.[8]

107.    Defendant Occidental, as owner and operator of the Site that accepted disposal of toxic contaminants and solvents, and as generator of the waste, owed Plaintiffs and the Subclasses a cognizable duty to exercise reasonable care in the disposal of toxic chemicals.

108.    Defendants breached their duty of reasonable care which a reasonably prudent person should use under the circumstances by negligently storing, disposing of, or otherwise

---

[7] See, e.g., *Zellar v. Tompkins Community Hospital*, 508 N.Y.S.2d 84 (3d Dep't 1986) (failure of hospital to adopt adequate staffing program stated a cause of action for negligence); *Burgundy Basin Inn, Ltd. v. Watkins Glen Grand Prix Corp.*, 379 N.Y.S.2d 873 (4th Dep't 1976) (event organizer's failure to provide adequate security and crowd control stated a cause of action for negligence).

[8] Am Jur. 2d, Negligence § 1

causing the release into the ground toxic chemicals, and negligently permitting their release into the sewer systems, soil and surface and groundwater in and around the Site and in the vicinity of Plaintiffs' and the Subclass' real property.

109.    The release of the Contaminants into the sewer system, soil and surface and groundwater water is the proximate and legal cause of the injuries suffered by the Plaintiffs and the Subclasses to their health and well being and to their properties and the adjacent properties.

110.    To the extent that Defendants' actions resulted in the discharge and/or release of toxic contaminants into the sewer systems, soil and groundwater, thereby entering and injuring Plaintiff's and the Subclass Members' physical and mental well-being, their real and personal property, and their economic interests, Defendants are jointly and severally liable for all damages from contamination in this case, their physical and mental well-being, their real and personal property, and their economic interests.

111.    Upon learning of the release of the contaminants, Defendants owed Plaintiffs and the Subclasses a duty to timely notify them that the aforementioned release from the Site had occurred.

112.    Defendants breached that duty by failing to timely notify the Plaintiffs and the Subclasses of the release of the contaminants at the Site, and, consequently, in the vicinity of their homes and rental properties.

113.    As a result of Defendants' breaches of their duty to timely notify the Plaintiffs and the Subclasses, the Plaintiffs and the Subclasses were forestalled from undertaking effective and immediate remedial measures and Plaintiffs have expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years into the future.

114.    Upon learning of the release of the contaminants, Defendants owed Plaintiffs and the Subclasses a duty to warn the Plaintiffs and the Subclasses of the release of the contaminants and the dangers to the Plaintiffs, their property, and neighboring properties that resulted therefrom.

115.    Defendants breached this duty by failing to adequately warn the Plaintiffs and the Subclasses of the release of the contaminants and the potential dangers and harms that could result.

116.    As a result of Defendants' breaches of their duty to warn the Plaintiffs of the release of the contaminants and the potential dangers and harms that could result, the Defendants' actions and omissions are the proximate and legal cause of the injuries suffered by the Plaintiffs to their health and well being and to their properties and the adjacent properties.

117.    Defendants further had a duty to the Plaintiffs upon learning of the release of the contaminants to act reasonably to remediate, contain, and eliminate the spill before it injured Plaintiffs and their property and/or to act reasonably to minimize the damage to Plaintiffs' and the Subclass' property.

118.    Defendants breached that duty by failing to act reasonably to remediate, contain, the eliminate contaminants before they injured Plaintiffs and the Subclasses and their property and/or to act reasonably to minimize the damage to Plaintiffs' and the Subclass' property.

119.    As a result of Defendants' breaches of their duty to Plaintiffs and the Subclasses by failing to act reasonably to remediate, contain, and eliminate the contaminants, the Defendants' actions and omissions are the proximate and legal cause of the injuries suffered by the Plaintiffs and the Subclasses to their health and well being and to their properties and the adjacent properties.

120.    Defendants had a duty to the Plaintiffs and Subclasses to ensure that the Contaminants at the Love Canal site were sufficiently secure as to prevent the release of the

contaminants into the environment surrounding their facilities and into the Plaintiffs' homes and rental properties and neighboring properties.

121.    Defendants negligently breached their duties to the Plaintiffs and Subclasses to ensure that the Love Canal site was sufficiently secure as to prevent the release of the contaminants into the environment surroundings and, consequently, as a result of this breach, contaminants entered into the surrounding Plaintiffs' homes and rental properties.

122.    As a result of Defendants' breaches of their duty to Plaintiffs and the Subclasses by failing to ensure that the Site was safe and sufficiently secure as to prevent the release of the contaminants into the environment surrounding the Site, they are the proximate and legal cause of the injuries suffered by the Plaintiffs and Subclasses to their health and well being and to their properties and the adjacent properties.

123.    Defendants had a legal duty to properly contain the Site and remediate the contamination from the sewer system, and had full knowledge of the extent of the contamination and the threat it poses to human health and safety.

124.    Defendants willfully and wantonly breached their legal duty to properly remediate the contamination despite full knowledge of the extent of the contamination and the threat it poses to human health and safety.

125.    Upon information and belief, the contamination is still present in the sewer system and represents a continuous, on-going and future hazard to the Plaintiffs and Subclasses.

126.    As a result of Defendants' breaches of their legal duty to properly remediate the contamination despite full knowledge of the extent of the contamination and the threat it poses to human health and safety, they are the proximate and legal cause of the injuries suffered by the Plaintiffs to their health and well being and to their properties and the adjacent properties.

48

127.    Each and every one of these Plaintiffs and Subclasses suffered foreseeable injuries and damages as a proximate result of said Defendants' negligent breach of their duties as set forth above. At the time Defendants breached their duties to Plaintiffs and the Subclasses, Defendants' acts and/or failures to act posed recognizable and foreseeable possibilities of danger to Plaintiffs so apparent as to entitle Plaintiffs and the Subclasses to be protected against such actions or inactions.

128.    Accordingly, Plaintiffs and the Subclasses seek damages from Defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs and the Subclasses to their original position, including, but not limited to, injuries to persons, consequential damages for medical monitoring, the difference between the current value of their properties and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and consequential damages flowing from the trespass which are the natural and proximate result of Defendants conduct in an amount to be proved at trial. Upon information and belief such amount exceeds the jurisdictional amount of the lower courts.

## AS AND FOR A SECOND CAUSE OF ACTION:
## STRICT LIABILITY

129.    Plaintiffs and the Subclasses re-allege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

130.    Activities such as the disposal of and mismanagement of hazardous chemical wastes as is the case herein constitutes an abnormally dangerous activity for which strict liability will apply.

131.    Defendants' aforesaid failure to employ reasonable care which a reasonably prudent person should use under the circumstances by storing, disposing of, or otherwise releasing into the

ground, air and water toxic substances, constitutes ultra-hazardous and abnormally dangerous activities involving ultra-hazardous, abnormally dangerous substances.

132.    Defendants allowed or caused these ultra-hazardous and abnormally dangerous substances to leak into the surrounding land, surface water, air, and sewer system, and in doing so, failed to warn Plaintiffs and the Subclasses of the dangerous condition that was caused thereby.

133.    The risks posed by such activities outweigh any value associated with the same.  As the result of said ultra-hazardous and abnormally dangerous activities, Plaintiffs and the Subclasses have suffered damages and imminent, substantial and impending harm to their health, families, and home values. Plaintiffs and the Subclasses have expended or will be forced to expend significant resources to safeguard their health and property, obtaining monitoring, testing, remediation services or equipment, as well as health monitoring, indefinitely for years and decades into the future.

134.    By reason of the foregoing, Defendants are strictly liable in tort for the damages sustained by Plaintiffs and the Subclasses.

135.    Accordingly, Plaintiffs and the Subclasses seek damages from Defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs and the Subclasses to their original position, including, but not limited to injuries to persons, consequential damages for medical monitoring, the difference between the current value of their properties and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and consequential damages flowing from the trespass which are the natural and proximate result of Defendants conduct in an amount to be proved at trial.  Upon information and belief such amount exceeds the jurisdictional amount of the lower courts.

## AS AND FOR A THIRD CAUSE OF ACTION:
## <u>NUISANCE</u>

136.    Plaintiffs and the Subclasses reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

137.    Under a cause of action for private nuisance, parties may be subject to liability for environmental contamination if their conduct invades another's private use and enjoyment of land and if such invasion is: 1) intentional and unreasonable; 2) negligent or reckless; or 3) actionable under the rules governing liability for abnormally dangerous conditions or activities.[9]

138.    Defendants Occidental/Hooker, GSH, MSRM, owned and continue own, occupied and continue to occupy, and controlled and continue to control the real property at the Site.

139.    Defendants City and NFWB owned and continue own and control the storm water and sanitary sewer system that serves the Site and all of the Plaintiffs' present or former homes.

140.    At all times mentioned herein, all Defendants had knowledge and/or notice of the hazardous nature of the waste at Love Canal.

141.    At all times mentioned herein, Defendants knew or should have known the dangerous condition that the contaminants presented and failed to take reasonable acts to cleanup, correct, or remediate that condition.

142.    Additionally, Defendants owed a duty to Plaintiffs and the Subclasses to take reasonable action to eliminate, correct, or remedy any dangerous condition existing on the Site that was reasonably foreseeable to injure Plaintiffs and the Subclasses and/or Plaintiffs' and the Subclass' real property, and of which they had knowledge and/or notice.

---

[9] *Copart Industries, Inc. v. Consolidated Edison Co. of New York, Inc.*, 41 N.Y.2d 564 (1977); *Snyder v. Jessie*, 546 N.Y.S.2d 777 (Sup 1989), *order aff'd as modified*, 565 N.Y.S.2d 924 (4th Dep't 1990); Restatement, Second Torts § 822.

143.    Further, Defendants owed a duty to exercise reasonable care to prevent a condition thereon from endangering the neighboring premises and occupants. Defendants have breached these duties, and each of them, by negligently, willfully, and/or wantonly creating a dangerous condition on the Site by allowing massive quantities toxic contaminants to be disposed of, or otherwise released into the ground, soil, groundwater and/or aquifer on the Site. This dangerous condition is reasonably foreseeable to cause injury and damage to Plaintiffs and the Subclasses and their property due to the size and nature of the releases of the Contaminants and the proximity of Plaintiffs and the Subclasses and their properties.

144.    Defendants owed a duty to Plaintiffs and the Subclasses to exercise reasonable care to keep the dangerous Contaminants from being discharged or allowed to escape, enter surrounding properties, and cause injury and damage.

145.    Defendants breached their duty to Plaintiffs and the Subclasses by failing to exercise reasonable care in the use of the Site to prevent endangering the neighboring premises and occupants.  Specifically, Defendants negligently, willfully, and/or wantonly allowed massive quantities of Contaminants to be disposed of, or otherwise released into the ground, soil, groundwater and/or aquifer at the Site.

146.    Defendants further breached their duty to Plaintiffs and the Subclasses by failing to exercise reasonable care in the use of the Site as prevent large and unknown quantities of the Contaminants to degrade, mix with other chemicals, and escape from their property and enter onto and under Plaintiffs' and the Subclass' property.  The above-described breaches endangered, injured, and damaged the neighboring premises and occupants.  Such a dangerous condition is reasonably foreseeable to cause injury and damage to Plaintiffs and the Subclasses and their property.

147.    Defendants' breach caused dangerous Contaminants to be released onto Plaintiffs and the Subclass' land and caused noxious gases, fumes and odors to emanate from their soil and homes.   This breach is continuous and on-going.

148.    Additionally, this breach has caused Plaintiffs and the Subclasses injury to their persons and property that is certain, substantial, and this resulting condition interferes with Plaintiffs and the Subclass' physical comfort.

149.    Plaintiffs and the Subclasses seek general damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses sustained, and to restore Plaintiffs and the Subclasses to their original position, including, but not limited injuries to persons,  consequential damages for medical monitoring, the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and the direct and consequential damages flowing from the trespass and resulting condition which are the natural and proximate result of Defendants conduct in an amount to be proved at trial. Upon information and belief, such amount exceeds the jurisdictional amount of all lower courts.

### AS AND FOR A FOURTH CAUSE OF ACTION:
### TRESPASS

150.    Plaintiffs and the Subclasses re-allege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

151.    Environmental contamination of a property constitutes a trespass as it interferes with the conditions of the property.[10] This act of trespass is, in and of itself, objectionable.[11]

---

[10] See *State v. Fermenta ASC Corp.*, 630 N.Y.S.2d 884 (Sup 1995), aff'd in part, 656 N.Y.S.2d 342 (2d Dep't 1997).

[11] See *PBN Associates v. Xerox Corp.*, 517 N.Y.S.2d 1015 (Sup 1987), *judgment modified*, 529 N.Y.S.2d 877 (2d Dep't 1988) *and decision modified on reargument on other grounds*, 575 N.Y.S.2d 451 (2d Dep't 1991).

152.    Upon information and belief, Defendants had knowledge of the hazardous nature of their waste and the ability to excavate and remove it from the Site to a proper hazardous waste facility at all relevant times.

153.    Upon information and belief Defendants' negligent, willful, and/or wanton actions and/or intentional failures to act caused an uncontrolled quantity of Contaminants to be spilled, disposed of, or otherwise released into the sewer systems, ground, soil, groundwater, and aquifer at the Site.

154.    Upon information and belief, the contaminants disposed of, or otherwise released into the sewer systems, ground, soil, groundwater, and aquifer at the Site entered and trespassed, and continue to trespass upon the land and realty of the Plaintiffs and the Subclasses, thus interfering with the condition of Plaintiffs and the Subclass' properties and the neighboring properties, causing an injury to their possession and/or right of possession.

155.    Upon information and belief, Defendants took affirmative, voluntary, and intentional actions to dispose of the contaminants into the ground at the Site.

156.    Upon information and belief, Defendants had good reason to know or expect that the large quantities of Contaminants would pass through the sewer systems, soil, groundwater, and aquifer from the Site to the land of Plaintiffs and the Subclasses and the neighboring properties.

157.    Upon information and belief, the above-described affirmative, voluntary, and intentional acts were performed with the willful intent to cause the Contaminants to be disbursed through the sewer systems, soil, groundwater, and aquifer without regard for the inevitable transport onto the land, property and homes of Plaintiffs and the Subclasses and the neighboring properties.

158.     Defendants' actions in disposing of uncontrolled amounts of the Contaminants into the sewer systems, soil, groundwater, and aquifer were done with actual malice, and in wanton and willful and/or reckless disregard for Plaintiffs and the Subclass' rights, health and property.

159.     These voluntary and intentional actions resulted in the trespass of the Contaminants, which is continuing and ongoing on to the Plaintiffs and the Subclass' and neighboring and properties, thus interfering with the condition of Plaintiffs and the Subclass' and neighboring property, causing injury and damage to Plaintiffs and the Subclasses, their property and their right of possession of their property.

160.     Based upon the above, Plaintiffs and the Subclasses seek general damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses sustained by Plaintiffs and the Subclasses and to restore Plaintiffs and the Subclasses to their original position, including, but not limited to, injuries to persons, consequential damages for medical monitoring, the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, consequential damages flowing from the trespass which are the natural and proximate result of Defendants conduct, and exemplary or punitive damages.

## DAMAGES SOUGHT BY THE CLASS

161.     Plaintiffs and the Subclasses re-allege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

162.     Plaintiffs and the Subclasses have been and continue to be exposed to elevated and hazardous levels of toxic and hazardous substances, including but not limited the Contaminants.

163.     Plaintiffs and the Subclasses were and continue to be exposed to the elevated and hazardous level of toxic and hazardous substances through dermal contact with contaminated soil, ingestion and dermal contact with fruits and vegetables and other items grown or developed in the contaminated soil, the ingestion and/or inhalation of toxic matter, and the continued physical contact with contaminated soil, vapors, and debris.

164.     Plaintiffs and the Subclasses have sustained and will continue to sustain damages to their property as a result of Defendants' actions. As a result, Plaintiffs and the Subclasses seek monetary damages for each violation of the First through Fourth Claims for Relief.  In particular, Plaintiffs and the Subclasses seek (i) monetary damages for personal injuries; (ii) monetary damages reflecting the cost to remediate Subclass Members' property of the contamination caused by Defendants' conduct or, in the alternative, to compensate Plaintiffs and Subclass Members for the diminution in value of their property caused by Defendants' conduct; (iii) and monetary damages to compensate Plaintiffs and Subclass Members for the loss of the use and enjoyment of their properties caused by Defendant's conduct.

165.     Plaintiffs and the Subclasses also seek consequential damages sufficient to fund a medical monitoring program[12] that is reasonably tailored to the exposure risks of the contaminants emanating from Defendants' property.

166.     As cancer risk from multiple agents is additive, the cumulative cancer risk posed by multiple contaminants is consequently greater that the risk posed by any single contaminant.

167.     Defendants continued negligent acts and omissions in operating and maintain the Site are the proximate cause of higher than normal, in fact excessive exposure, to hazardous substances and contaminants, including but not limited to the Contaminants.

---

[12] Medical Monitoring is not being sought as in independent cause of action but, rather, as consequential damages in connection with the personal injury and property claims sought herein as is appropriate. *See Ivory v. Int'l Bus. Machines Corp.*, 983 N.Y.S.2d 110 (2014), *leave to appeal denied*, 11 N.E.3d 204 (2014).

168.    The resulting exposure has significantly increased the risk of Plaintiffs and the Subclasses of contracting serious latent diseases, including but not limited to lung, skin, breast, bladder, liver, kidney, prostate cancer, and other cancers, permanent intellectual and behavioral effects on child development, effects on the central nervous system, respiratory, and other diseases and conditions.

169.    Each and every one of these Plaintiffs and Subclass Members will incur future expenses for medical monitoring and, as a result, seek payment of their related medical expenses as an element of the consequential damages.

170.    In order to compensate Plaintiffs and the Subclasses for damages suffered due to Defendants' acts, each and every Plaintiff and Subclass Members requires, among other things, that Defendants collectively pay the future costs of obtaining necessary medical care, toxicological examinations and diagnoses, and any other medical monitoring necessary in order to ascertain and treat the nature and extent of the injuries suffered due to the contamination that emanated and continues to emanate from the Site.  Many of these costs would not be covered by health care insurers, and if covered, may unfairly result in increased premiums.

171.    Each and every one of these Plaintiffs' and Subclass Members' are at a significantly elevated risk resulting from their exposure to hazardous substances and chemicals in and around their homes in the Love Canal Area can only be mitigated and/or addressed by the creation of a medical monitoring program (the "Program") including but not limited to:

a.    Establishing a program that provides education and outreach on the existence and availability of the services established under the medical monitoring program, including but not limited to the establishment of a public Website with information about the  Program, meetings with potentially eligible populations, development and dissemination of outreach materials

informing Love Canal Area residents about the program, and the establishment of phone information services;

    i.    Funding medical monitoring for those individuals exposed to the Contaminants described of herein;

    ii.    Funding research into possible cures for the detrimental effects of breathing, living and working near the contaminants and toxicants present in the Love Canal Area as a result of the acts and omissions alleged here;

    iii.    Gathering and forwarding to each and every one of these Plaintiffs' and Subclass Members' treating physicians' information related to the diagnosis and treatment of injuries which result from their exposure(s) in and around the Love Canal Area;

    iv.    Aiding in the early diagnosis and treatment of resulting injuries through ongoing testing and monitoring of each and every one of these Plaintiffs and the Subclasses.

    v.    Funding further studies of the long-term effects of the exposure.

172.    Prescribed monitoring procedures exist that makes the early detection of these diseases possible.

173.    The monitoring procedures or regimes are different from normally recommended procedures that would be used in the absence of the exposure.

174.    The prescribed medical monitoring is reasonably necessary according to contemporary scientific principals for persons such as Plaintiffs and the Subclasses who have been exposed and continue to be exposed to excessive levels of the referenced hazardous chemicals and materials.

175.    Plaintiffs and the Subclasses will suffer irreparable harm if the requested medical monitoring program is not implemented because they are in danger of suffering catastrophic latent diseases as a result of their prolonged exposure to toxic and hazardous substance caused by Defendants' negligence.

176.    Detection of these diseases and early treatment is medically reasonable and necessary to prevent progression and further injuries.

177.    It is also medically reasonable and necessary to collect data and coordinate study efforts for persons exposed to such substances in order to effectively treat Plaintiffs and the Subclasses.

178.    Establishment of a medical monitoring program for the Plaintiffs and the Subclasses is essential as a consequential damage from their exposure to the contaminants because without the requested medical monitoring programs, they will be subjected to further injuries and delayed treatment.

179.    Plaintiffs and the Subclasses request that the Court appoint a plan administrator, require the Defendants to fund the medical monitoring plan, and reserve jurisdiction to enforce the terms and conditions of the plan.

180.    Accordingly, Plaintiffs and the Subclasses are entitled to a medical monitoring program which provides for medical testing, surveillance, monitoring, and study of the Plaintiffs and the Subclasses for conditions caused by exposure to the references substances, as well as payment of their attorney's fees and expenses, and any other relief this court deems just and proper.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs and the Subclasses, on behalf of themselves and all others similarly situated request the Court to enter judgment against Defendants as follows:

A. As and for the First Cause of Action sounding in negligence, Plaintiffs and the Subclasses seek general damages from Defendants, in an amount to be determined at trial, directly resulting from their personal  injuries and property damages in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs and the Subclasses to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, and consequential damages flowing from the trespass which are the natural and proximate result of Defendants' conduct in an amount in excess of the jurisdictional minimum, as well as punitive damages, exclusive of interest, costs, and attorneys' fees.

B. As and for the Second Cause of Action sounding in strict liability, Plaintiffs and the Subclasses seek general damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs and the Subclasses to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and consequential damages flowing from the trespass which are the natural and proximate result of Defendants' conduct in an amount in excess of the jurisdictional minimum, as well as punitive damages, exclusive of interest, costs, and attorneys' fees.

C. As and for the Third Cause of Action sounding in nuisance, Plaintiffs and the Subclasses seek general damages from Defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained by Plaintiffs and the Subclasses and to restore Plaintiffs and the

Subclasses to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and direct and consequential damages flowing from the nuisance and trespass which are the natural and proximate result of Defendants conduct in an amount in excess of the jurisdictional minimum, as well as punitive damages, exclusive of interest, costs, and attorneys fees.

D. As and for the Fourth Cause of Action sounding in trespass, Plaintiffs and the Subclasses seek general damages from Defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained, and to restore Plaintiffs and the Subclasses to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and the direct and consequential damages flowing from the trespass and resulting condition which are the natural and proximate result of Defendants conduct in an amount in excess of the jurisdictional minimum as well as punitive damages, exclusive of interest, costs, and attorneys fees.

E. As and for the combined claims on each of the foregoing causes of action, all of which flow directly as a result of the wanton, willful and reckless conduct of the Defendants and each of the Defendants herein, Plaintiffs and the Subclasses seek exemplary or punitive damages in addition to the compensatory damages set forth, *supra*, in an amount to be determined at trial.

F.  An Order mandating that the Defendants, and each of them, and their successors and assigns, take every action necessary to assure that all relief requested herein is obtained and fully funded;

G.  Award Plaintiffs and the Subclasses the costs of this lawsuit, including but not limited to attorneys' fees and expert costs.

H.  Awarding Plaintiffs such other, further, and different relief as the Court may deem appropriate and just.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of all claims asserted in this Complaint.

Dated: Melville, New York

May 30, 2018

Respectfully submitted,

NAPOLI SHKOLNIK PLLC
*Attorneys for Plaintiffs and the Proposed Class*


By: /s/ *Tate J. Kunkle*
Tate J. Kunkle
Paul J. Napoli
Louise Caro (*PHV forthcoming*)
360 Lexington Ave., 11th Floor
New York, NY, 10017
Tel: (212) 397-1000
Fax: (646) 843-7603
tkunkle@napolilaw.com
pnapoli@napolilaw.com
lcaro@napolilaw.com